UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,          Case Number 02-10149

v.                             Honorable David M. Lawson

MARION L. KINCAID TRUST and
MARION L. KINCAID, TRUSTEE,

                Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR ATTORNEY'S FEES AND EXPENSES AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR REVIEW OF CLERK'S ACTION DENYING COSTS

The government originally filed suit against the defendants, owners of residential property on the shore of Saginaw Bay, for violations of the Clean Water Act (CWA) and the Rivers and Harbors Act (RHA) based upon its belief that they were conducting unauthorized grading and dozing activities on their property on the bottom lands and wetlands of Lake Huron. The merits action was dismissed with prejudice. However, this matter is now before the Court on the defendants' motion for attorney's fees and expenses and the defendants' motion for review of clerk's action denying costs. On December 3, 2003, the Court ordered the parties to present supplemental briefs relating to whether costs and attorney's fees can and should be awarded to the defendants pursuant to Rule 11 of the Federal Rules of Civil Procedure. Motion papers have been filed by all parties relating to the issue, and the Court heard oral argument on May 4, 2004. The Court now finds that the defendants are the prevailing parties in the matter; although the government investigation and reliance on a theory of liability tied to the concept of an "administrative high water mark" has no justification in existing law, it's position was substantially justified based on a theory

of liability intended to protect wetlands; the defendants may not receive Rule 11 sanctions because they did not adhere to the safe harbor procedures set forth in the rule; the defendants are not entitled to attorney's fees under their alternate theories; and the defendants are entitled to some relief from the Clerk's actions regarding their bill of costs. Therefore, the Court will deny the motion for attorney fees and grant in part and deny in part the motion to review the Clerk's denial of costs.

I.

Herb and Marion Kincaid, a retired couple, own a beachfront home near Caseville, Michigan, along the shore of Saginaw Bay. According to the government, an Engineer Corps' investigator, William Leiteritz, was driving down M-25 in May of 2001 when he noticed a bulldozer in the water on property adjacent to the Kincaids' land. He "got out, talked to the bulldozer operator . . . [and] could see that there had been several properties where the grading activity had been performed, and the bulldozer operator told [him] that he had done the work." Defs.' Supp. Br. Mot. for Atty. Fees Ex 1, Leiteritz Dep. at 105. Leiteritz also "spoke to the property owner [of the adjacent property] that day. He [the Kincaids' neighbor, Richard or Robert Gillingham] was – he was down in the beach area. He indicated that this was work that they had done on a fairly routine – fairly regular basis." *Ibid.* This was the extent of Lieteritz's initial examination of the Kincaid property. Apparently, Lieteritz made no contact with the Kincaids at that time. On June 5, 2001, the Kincaids hired Beachy Esch Excavating to perform grooming work on their beach. Defs.' Supp. Br. Mot. for Atty. Fees Ex. 4, Decl. of Marion Kincaid at ¶ 4. Before that time, the Kincaids state that they "primarily used a hand rake to level and smooth the sand on our beach which was wind-blown during the winter months; however, we have also had the sand leveled by a bulldozer a handful of times (approximately 6 or 8 times) in the past 50 years." *Ibid.* The Kincaids turned to mechanical

aid to level the sand on that sole occasion in 2001 because "the work became too back breaking for us to do ourselves." *Ibid.*

On June 14, 2001, Leiteritz caused cease and desist letters to be sent out to all of the residents from Gilingham's property to the Kincaids' property based upon the results of his investigation on May 18, 2001. The letter to the defendants reads:

> Marion Kincaid[] Trust
> 7688 Port Austin Road
> Pigeon, Michigan 48755
>
> Dear Sir:
>
> My representative recently inspected your property at 7688 Port Austin Road, Pigeon, Michigan (Section 4, Township 17N, Range 10E). The inspector reported that an unauthorized beach grading operation had taken place at this site.
>
> In Lake Huron as in all navigable waters of the United States including their adjacent wetlands, any construction or discharge of dredged and/or filled material must be authorized by the Department of the Army. The authority of the Corps of Engineers to regulate construction or other work in navigable waters of the United States is contained in Section 10 of the Rivers and Harbors Act, Section 404 of the Clean Water Act and regulations promulgated pursuant to these Acts. Please be advised that filling and grading work, mechanized landclearing, the sidecasting of excavated material, and some forms of piling installation constitute or otherwise involve discharges of dredged and/or fill material under the Corps' regulatory authority.
>
> I hereby direct all persons responsible for and/or involved in this activity to cease and desist from further unauthorized activities within the navigable waters of the United States.
>
> This incident is currently under review, after which a recommendation may be made to the U.S. Justice Department concerning initiation of legal action against the responsible party or parties. To assist me in my evaluation of the pertinent facts, you have the opportunity to furnish me any appropriate information, which will become a part of the record and as such may be used against the responsible party in any proceedings.
>
> We have enclosed a brochure to explain the need to protect Great Lakes coastal wetlands. I request your written reply within fourteen (14) days to the attention of William E. Leiteritz . . . .

Sincerely,
Robert Tucker
Chief Enforcement Branch
Regulatory Office

Defs.' Supp. Br. Mot. for Atty. Fees Ex. 2, Letter from Tucker to Kincaid Trust of 6/14/01. The

Kincaids replied to this letter on June 21, 2001 as follows:

Dear Sir:

I do not totally understand your letter of June 14, 2001. The only action that I have taken on the beach is the leveling of sand that accumulated in piles along snow fencing. I installed this fencing to collect sand over the winter. I tried leveling this sand by hand with a wheelbarrow. It was backbreaking work and at the end of eight hours, I had not made a dent in the accumulated sand. There was a bulldozer driving along the beach. I asked the operator to please level my piles of sand, which he did in less than an hour. I couldn't have done that by hand if I worked all summer.

This beachfront property has been in the family for five decades. The original landowners along this four-mile stretch of property on Saginaw Bay owned the land to the water's edge. During this time, water levels have varied greatly. There was a period in the 1960's when the water was approximately as low as it is now. During this period of time, we have never experience any wetlands. There are pictures available which cover this time period.

Beach erosion has never been a problem. The wind and wave action are directed toward shore and build up the beach area.

I do admit that the vegetation I have seen growing the last two years is the worst I have ever seen and water does accumulate in low spots after a heavy storm. This water generally dissipates after a few days of hot weather. There has never been any vegetation in the water, no matter what the water level.

In summary, this is our permanent residence and we consider the beach front to be our front yard. It is 175 feet from our house to the water's edge. If I interpret your letter correctly, it states that I can do nothing to level sand that accumulates over the winter. I disagree with this position and believe this is totally unfair and inappropriate.

Sincerely,
Marion L. Kincaid
Trustee of the Marion L. Kincaid Revocable Trust

-4-

Defs.' Supp. Br. Mot. for Atty. Fees Ex. 4, Letter from M. Kincaid to Dep't of Army of 6/21/01.

The government brought suit against the Kincaids, but not against any of their neighbors. Donald Reinke, a  representative of the Army Corps of Engineers, explained that he pursued an action against the Kincaids instead of others based on the Corps' decision "to select two or three representative cases . . . of unauthorized work on exposed bottom lands of Saginaw Bay . . . [to] try and forward to the Office of Council for legal action."  Defs.' Supp. Br. Mot. for Atty. Fees Ex 7, Reinke Dep. at 12.  Reinke, a biologist in the Corps' Detroit Regulatory Office, selected these cases and described his process of selection as follows: "It was basically random, but we had a, again, quote, unquote, pool of individuals that, you know, we had on record of performing unauthorized work on the exposed bottom lands of Saginaw Bay.  We picked out of that pool people who responded either in writing or electronically or by phone to our letters that notified them that their work was conducted without necessary Corps permits.  And out of that grouping of people we picked people that continued to do unauthorized work even after they were given notification and had responded." *Id.* at 16.  Gary R. Mannesto, Supervisor of the Corps' Detroit Regulatory Office, also opined that the decision was made to initiate a legal enforcement action against the Kincaids because "[i]t was felt it was necessary to pursue a few of these [cases] and our enforcement people reviewed them and picked out what they felt to be the most appropriate cases."  Defs.' Supp. Br. Mot. for Atty. Fees Ex 12, Mannesto Dep. at 78.  When asked if the Kincaids were chosen solely for the deterrent effect of such a lawsuit, Mannesto responded, "It was probably an element of it. I mean certainly case specific they felt it was a good situation why they selected that one but certainly an element was they want other people to also stop, yes." *Id.* at 79.

Leiteritz conducted a follow-up visual inspection of the Kincaids' property on August 14, 2001. Again he was not physically on their property nor did he speak to the Kincaids. He made the following observations: "That additional beach grading and placement of fill material in the wetlands located below the ordinary high water mark has continued at the site since the cease and desist letter was made in June." Leiteritz Dep. at 134. The following observations led him to that conclusion: "The – the properties in that area that had been left undisturbed had – the wetland vegetation was starting to reestablish. They were starting to look very much different than the Kincaid property. . . . There was on the Kincaid property evidence of what appeared to me to be wheeled – mechanized equipment had been across the property, and the property looked like it had been recently graded . . . it was all nice and smooth and level, and there weren't any sand dunes forming. There wasn't – there wasn't a beach ridge forming behind the – in the – in the area of the wave run-up where the little low beach ridge likes to form." *Id.* at 134-35.

The decision to pursue the action against the Kincaids was explained further in an affidavit filed by the assistant United States Attorney, who responded to the motion for Rule 11 sanctions. She wrote:

> 5. I also asked Donald Reinke if the recently bulldozed area of the Kincaid property that Mr. Leiteritz observed was below the Ordinary High Water Mark [OHWM]. He said without question it was. He indicated that present water levels on Lake Huron were very low. He further indicated that William Leiteritz was familiar where the OHWM was in this area. He said that the OHWM was within about 60 feet of the Kincaid residence.
>
> . . .
>
> 7. The Corps' litigation report provided that no permit for work had been obtained for the Kincaid property. Mrs. Kincaid's letter admitted that she had had sand on her beach moved by a bulldozer. Even if she only moved sand away from the snow fence and back to the beach, this was a violation of Section 10 of the Rivers and

Harbors Act.  As later confirmed by the surveyor, the snow fence was above the OHWM.

. . .

11.  Based on this information, I believed that there was sufficient basis to assert that the owner of the Kincaid property had performed work in a wetland in violation of Section 404 of the Clean Water Act.

12.  I was aware that the Corps had used an administrative OHWM since at least the early 70s for all the permits and enforcement actions.  I contacted Donald Reinke and asked for the document establishing the OHWM.  I received the study and documents establishing the administrative OHWM as an elevation of 580.8 feet IGLD [International Great Lakes Datum].  I also received a document showing that this was changed to 581.5 feet IGLD in 1985.  I again contacted Donald Reinke who gave me an explanation for this with the bottom line being the "point on sand" had not changed but only what it was called.  I did a legal search and found that the administrative OHWM had never been overruled or criticized.  I found that it was referenced as a fact in at least one case.  Consequently, I believed that there was a reasonable basis for the Corps' determination of OHWM on Lake Huron.

Pl.'s Resp. to Defs.' Supp. Br. Ex. 1, Halliday Aff. at ¶¶ 5, 7, 11-12.

On May 28, 2002, the United States sued Mrs. Kincaid, the titleholder to the property at issue, accusing her of "conduct[ing], or caus[ing] to be conducted unauthorized discharges of fill material by the tilling, grading, or dozing of sand and sediments below the ordinary high water mark of Lake Huron" in violation of 33 U.S.C. §§ 406, 1311, 1319, and 1344.  Complaint at ¶¶ 4, 8.  The complaint sought penalties up to $25,000 per day, or over $9 million per year.  The Kincaids in turn filed an answer with affirmative defenses on June 26, 2002, and on July 8, 2002 they filed a counter-complaint against the plaintiff requesting declaratory judgments that they did not discharge a fill material or a dredge material, any activities in violation of the Rivers and Harbors and Clean Water Acts be found to be preauthorized by general permit, and the Corps' regulations at issue are vague, overbroad, illegal, and invalid under both Acts.  Additionally, the Kincaids sought a permanent injunction enjoining and restraining the Corps from and against the continuation of programs and

illegal and improper actions complained of and from further continued illegal extension of regulatory jurisdiction. Finally, they sought attorney's fees and costs under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412. They claim that the government's institution of the present action was: "A. not substantially justified; B. made in bad faith; C. not based on reasonable investigation; and D. without proper legal or factual foundation." Counter-compl. at ¶ 59. The government answered their counter-complaint on September 6, 2002. On February 14, 2003, the Kincaids filed a motion to compel information regarding the plaintiff's experts or alternatively to strike the plaintiff's expert witnesses; on March 4, 2003, the Kincaids filed a motion for summary judgment; on March 14, 2003, the Court granted the defendants' motion to compel discovery but denied their motion to strike on April 16, 2003. A hearing on the summary judgment motion was set for June 25, 2003.

On May 20, 2003, the government submitted a "stipulation" signed only by attorneys for the plaintiff to dismiss the case with prejudice. The defendants did not oppose the dismissal, so that same day the Court entered the following Order disposing of the matter: "The parties having stipulated and agreed; IT IS ORDERED that this case be and hereby is DISMISSED with prejudice." Order Granting Extension of Dispositive Motion Cut-off Date (Apr. 23, 2003) [dkt. #66].

On June 19, 2003, the Kincaids filed their motion for attorney's fees and costs against the government under the Equal Access to Justice Act. They also filed a Bill of Costs that same day. On June 20, 2003, the Court bifurcated the issue of whether the Kincaids were entitled to attorney's fees from the amount, if any, to be awarded. The Clerk denied costs on June 30, 2003. On July 8, 2003, the Kincaids filed a motion seeking review of the Clerk's actions in denying costs. The Court

-8-

thereafter directed the parties to file supplemental briefs addressing the application of Rule 11 to the matter and, after oral argument, took the matters under advisement.

## II.

The Equal Access to Justice Act states:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses . . . incurred by that party in any civil action . . . brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). For the purpose of this statute, "fees and other expenses" includes reasonable attorney fees. 28 U.S.C. § 2412(d)(2)(A). The "position of the United States" encompasses the action of the government agency upon which the suit is based and the government's litigating position. 28 U.S.C. § 2421(d)(2)(D). Once a party seeking fees under the EAJA has shown the he or she has prevailed in a suit involving the government, the government has the burden of proof in establishing that its position was "substantially justified." *Sigmon Fuel Co., v. Tennessee Valley Auth.*, 754 F.2d 162, 166 (6th Cir. 1985) (citing *Berman v. Schweiker*, 713 F.2d 1290, 1293 n.9 (7th Cir. 1983)). "Substantial justification" is found when the position of the government, in both law and fact, could satisfy a reasonable person. *Jankovich v. Bowen*, 868 F.2d 867, 869 (6th Cir. 1989).

The government argues that the defendants are not entitled to fees because neither component of the formula has been satisfied. It contends that the defendants did not prevail because the suit was terminated by an order of dismissal rather than a judgment in their favor. The government also insists that it was substantially justified in maintaining that the Kincaids moved

sand on Great Lakes bottom land – that is, land below the administrative ordinary high water mark – and in the adjacent wetlands.

### A.

In arguing that the plaintiff is not a "prevailing party," the government relies heavily on *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Res.*, 532 U.S. 598 (2001), a case decided under the fee-shifting provisions of the Fair Housing Amendments Act and Americans with Disabilities Act. In that case, the plaintiffs brought an action against a state agency but dismissed the case when the state legislature enacted legislation, arguably in response to the lawsuit, that provided the plaintiffs with the relief they sought. The plaintiffs then sought attorney's fees and costs in the theory that they prevailed in their case because their lawsuit was the catalyst for the legislative changes that occurred. The Supreme Court rejected that argument. After engaging in a detailed analysis of the term "prevailing party," the Court concluded that to qualify for fees, a party must do more than be a catalyst for change. Instead, the Court limited the term to encompass only two types of circumstances when a party brings an action. The first requires a judgment on the merits; the second envisions a settlement agreement enforced through a consent decree. *Id.* at 603-05.

The defendants respond that the rationale of *Buckhannon* does not apply in this present case because they did not initiate the litigation, the dismissal was not pursuant to a settlement agreement, and they received all they could hope to obtain – a dismissal with prejudice – in the termination of the lawsuit. The Court agrees.

There are several federal statutes that provide for costs and attorney's fees to a prevailing party, and the Sixth Circuit has stated that these provisions should be interpreted consistently.

-10-

*Chambers v. Ohio Dep't of Human Serv.*, 273 F.3d 690, 692 n.1 (6th Cir. 2001) (interpreting fee-shifting statute under 42 U.S.C. § 1988 consistently with the Fair Housing Amendments Act, 42 U.S.C. § 3613(c)(2), and the Americans with Disabilities Act, 42 U.S.C. § 12205) (citing *Buckhannon*, 532 U.S. at 610). The Supreme Court has held that the "touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792-93 (1989). To be considered as "prevailing," a party "must be able to point to a resolution of the dispute which changes the legal relationship between itself and [the opposing party]." *Id.* at 792. Only "a *judicially sanctioned* change in the legal relationship of the parties" can provide the basis for awarding a party costs and attorney's fees. *Chambers*, 273 F.3d at 692 (citation omitted). Such a resolution may consists only of legal vindication, even if the damages are nominal. *Buckhannon*, 532 U.S. at 603-04; *Farrar v. Hobby*, 506 U.S. 103, 109-11 (1992); *see Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1192 (6th Cir. 1995) (holding that "[t]he vindication of rights under the First and Fourteenth Amendments, whether or not such rights had been infringed upon, constitutes relief such that Plaintiffs should be deemed prevailing parties," although no damages had been awarded).

The Sixth Circuit has not explicitly held in a published opinion that a voluntary dismissal of a complaint with prejudice under Federal Rule of Civil Procedure 41 serves to render the defendant a prevailing party under 28 U.S.C. § 2412. However, the weight of available authority suggests that the Sixth Circuit would adopt such a rule. A majority panel of that court deciding an unpublished case agreed that defendants were prevailing parties based on a plaintiff's voluntary dismissal. *See Roane v. City of Mansfield*, 2000 WL 1276745 at *2 (6th Cir. 2000). The majority of federal courts have reached the same conclusion. *See Zenith Ins. Co. v. Breslaw*, 108 F.3d 205, 207 (9th Cir. 1997),

-11-

abrogated on other grounds by *AMAE v. California*, 231 F.3d 572 (9th Cir. 2000) (en bank); *Cantrell v. Int'l Bhd. of Elec. Workers*, 69 F.3d 456, 458 (10th Cir. 1995); *Sheets v. Yamaha Motors Corp., U.S.A.*, 891 F.2d 533, 539 (5th Cir. 1990); *Schwarz v. Folloder*, 767 F.2d 125, 130 (5th Cir. 1985); *United States v. Rogers*, 2003 WL 21212749 at *3-4 (E.D. Tenn. Apr. 3, 2003) (unpublished) (compiling cases); *Beer v. John Hancock Life Ins. Co.*, 211 F.R.D. 67, 70 (N.D. N.Y. 2002); *Uniflow Mfg. Co. v. Superflow Mfg. Corp.*, 10 F.R.D. 589 (N.D. Ohio 1950); 10 Wright & Miller § 2667, pp. 209-10 n.14; *see also Kona Enter., Inc. v. Estate of Bishop*, 229 F.3d 877, 889 (9th Cir. 2000)).

A majority of courts also hold that a defendant is entitled to the full legal relief of a judgment on the merits where a plaintiff voluntarily dismisses a complaint under Federal Rule of Civil Procedure 41(a). *Dean v. Riser*, 240 F.3d 505, 509 (5th Cir. 2001); *Catz v. Chalker*, 142 F.3d 279, 287 (6th Cir. 1998), opinion amended on denial of rehearing,243 F.3d 234 (6th Cir.2001); *Israel v. Carpenter*, 120 F.3d 361, 365 (2d Cir.1997); *Breslaw*, 108 F.3d at 207; *NBN Broad., Inc. v. Sheridan Broad. Networks, Inc.*, 105 F.3d 72, 78 (2d Cir. 1997); *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 345 (2d Cir. 1995); *Samuels v. Northern Telecom, Inc.*, 942 F.2d 834, 836 (2d Cir. 1991); *Harrison v. Edison Bros. Apparel Stores, Inc.*, 924 F.2d 530, 534 (4th Cir. 1991); *Nemaizer v. Baker*, 793 F.2d 58, 61 (2nd Cir. 1986); *Schwarz*, 767 F.2d at 130; *Rogers*, 2003 WL 21212749 at *3-4; *Storey v. Cello Holdings, L.L.C.*, 182 F. Supp. 2d 355, 361-62 (S.D. N.Y. 2002); *Beer*, 211 F.R.D. at 70)).  Moreover, the plaintiff's voluntarily dismissal of a cause of action with prejudice "is a complete adjudication of the issues presented by the pleadings and is a bar to further action between the parties" under the doctrine of *res judicata*.  *Smoot v. Fox*, 340 F.2d 301, 303 (6th Cir. 1964).  This Court holds that the voluntary dismissal of a complaint with prejudice renders a defendant a "prevailing party" for the purpose of 28 U.S.C. § 2412(a) and (d).

-12-

In this case, the Court entered an order on May 20, 2003 that dismissed the action with prejudice.  That order altered the legal relationship of the parties because it prevents the plaintiff from filing these claims a second time.  Although no money changed hands as a result of the Court's order, the defendants' exercise of their property rights – challenged by the government through the litigation – was vindicated.

The government claims that the defendants did not prevail because they forewent their counterclaims in exchange for the government's voluntary dismissal.  That argument is unpersuasive, however, because the counter-complaint did not seek affirmative relief; rather, the defendants sought a declaratory judgment against the government that their activities did not violate any laws.  The *res judicata* bar of future government claims created by the government's voluntary dismissal gives the defendants the relief they sought through their counterclaim.  The Court finds, therefore, that the defendants are prevailing parties even though they agreed to the dismissal of their counterclaims along with the government's claims.

## B.

The government next contends that its position was substantially justified because its investigation gave it reason to believe that the Kincaids were moving sand on the bottomland and wetlands of the Great Lakes in violation of the CWA and the RHA.  The government alleged that the defendants "conducted, or caused to be conducted, unauthorized discharges of fill material by the tilling, grading or dozing of sand and sediments below the ordinary high water mark of Lake Huron, adjacent to the property located at 7688 Port Austin Road, Pigeon, Michigan."  Compl. at ¶ 7.

The CWA prohibits the discharge of pollutants except in compliance with a National Pollutant Discharge Elimination System (NPDES) permit issued under 33 U.S.C. § 402.  *See* 33 U.S.C. §§

-13-

1311(a), 1342(a).  The CWA defines "the discharge of a pollutant" to mean "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12)(A).  A "pollutant" is defined to include sand.  33 U.S.C. § 1362(6).  "Point source" has been interpreted to include bulldozers and mechanized equipment.  *United States v. Lambert*, 915 F. Supp. 797, 802 n.8 (S.D. W.Va. 1996); *see* 33 U.S.C. § 1362(14).  Section 404 of the CWA requires a permit for the discharge of fill material into navigable waters.  33 U.S.C. § 1344(a).  Under both sections, "navigable waters" are defined as "waters of the United States, including territorial seas."  33 U.S.C. § 1362(7).

The RHA provides that "it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States" without authorization from the Army Corps of Engineers.  33 U.S.C. § 403.  The government's theory here, presumably, was that the movement of sand on the Kincaids' beach occurred within the "navigable water of the United States."

In *United States v. Rands*, 389 U.S. 121, 123 (1967), the Supreme Court held that "[t]he navigational servitude of the United States does not extend beyond the high-water mark."  According to the Army Corps of Engineers' regulations, federal regulatory jurisdiction over rivers and lakes, that is, the navigational servitude of the United States, extends laterally to the entire water surface and bed of a navigable water body, "which includes all the land and waters below the ordinary high water mark."  33 C.F.R. § 329.11(a).

Regulations enacted under the CWA in effect at the time of the investigation in this case define "waters of the United States" more broadly to include "(1) traditional navigable waters, or 'waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign

-14-

commerce;' (2) impoundments of waters otherwise defined as covered waters; (3) tributaries of covered waters, including traditional navigable waters; and (4) wetlands adjacent to covered waters, including tributaries." 33 C.F.R. § 328.3(a)(1), (4), (5), (7). In *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985), the Supreme Court found that "waters of the United States" includes wetlands adjacent to covered waters where "the transition from water to solid ground is not necessarily or even typically an abrupt one."

The substantial justification of the position of the United States, therefore, depends on the reasonableness of its claim that the Kincaids engaged in discharging fill material, that is, tilling, grading, or dozing sand, either (1) below the ordinary high water mark; or (2) on wetlands. The Court will examine each theory in turn.

1.

As originally conceived, the concept of "ordinary high water mark" applied to lands that adjoined bodies of water that were subjected to the influence of the tides. *See, e.g. Shively v. Bowlby*, 152 U.S. 1, 11 (1894) (observing that under common law, "both the title and the dominion of the sea, and of rivers and arms of the sea, where the tide ebbs and flows, and of all the lands below high water mark, within the jurisdiction of the Crown of England, are in the king"). As an illustration, in *Borax Consolidated v. City of Los Angeles*, 296 U.S. 10 (1935), the Supreme Court applied the settled principle that lands below the high water mark were held in trust by the federal government for the states, and therefore could not be conveyed by a federal land patent. To resolve the dispute in that case, it became necessary to determine the location of the ordinary high water mark, which the Court defined as follows:

> The tideland extends to the high-water mark. . . . This does not mean, as petitioners contend, a physical mark made upon the ground by the waters; it means the line of high

-15-

water as determined by the course of the tides.  By the civil law, the shore extends as far as the highest waves reach in winter. . . . But by the common law, the shore "is confined to the flux and reflux of the sea at ordinary tides." . . . It is the land "between ordinary high and low water mark, the land over which the daily tides ebb and flow. When, therefore, the sea, or a bay, is named as a boundary, the line of ordinary high-water mark is always intended where the common law prevails."

*Id.* at 22-23.

Application of this concept to non-tidal waters has proved problematic, and in some cases controversial.  *See, e.g., Glass v. Goeckel*, 473 Mich. 667, 690, 703 N.W.2d 58, 71 (2005) (observing that "[w]hile this term has an obvious meaning when applied to *tidal* waters with regularly recurring high and low tides, its application to *nontidal* waters like the Great Lakes is less apparent"); *id.* at 705, 703 N.W.2d at 705 (Young, J., concurring and dissenting) (stating that "I remain convinced that the 'ordinary high water mark' concept on which the majority relies applies only to tidal waters, with their regularly recurring high and low tides").   Nonetheless, section 329.11 of the regulations enacted by the plaintiff defines the ordinary high water mark "on non-tidal rivers as the line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank; shelving; changes in the character of soil; destruction of terrestrial vegetation; the presence of litter and debris; or other appropriate means that consider the characteristics of the surrounding areas."  33 C.F.R. § 329.11(a)(1); *see also* 33 C.F.R. §§ 328.3(e), 328.4.  The meaning of this mark, however, must be considered within the definitional limits set forth by federal courts.  The Supreme Court has held that the "bed" of a navigable river does not include land covered by the "extraordinary freshets of the winter or spring, or the extreme droughts of the summer or autumn."  *United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad*, 312 U.S. 592, 596 (1941).  The ordinary high water mark has also been defined as the line where the water stands sufficiently long to destroy vegetation below it. *Goose Creek Hunting Club, Inc. v. United States*, 518

-16-

F.2d 579, 583 (1975); *United States v. 21.54 Acres of Land*, 491 F.2d 301, 306 (4th Cir. 1973) (describing "that line below which no terrestrial plant life will grow because of the constant action of the water"). It has also be defined as the line that "divides the upland from the river bed," the river bed being the "land upon which the action of the water has been so constant as to destroy vegetation. It does not extend to nor include the soil upon which grasses, shrubs and trees grow." *United States v. Chicago B & Q R. Co.*, 90 F.2d 161, 170 (7th Cir. 1937). Another court has defined the mark as "a natural physical characteristic placed upon the lands by the action of the river." *United States v. Claridge*, 279 F. Supp. 87, 91 (D. Ariz. 1966). The court in *Harrison v. Fite*, 148 F. 781, 783 (8th Cir. 1906), defined the ordinary high water mark as the line below which the soil is so usually covered by water that it is wrested from vegetation and its value for agricultural purposes destroyed. The Third Circuit has similarly defined the term as the line below which the waters have so visibly asserted their dominion that terrestrial plant life ceases to grow and, therefore, the value for agricultural purposes is destroyed. *Borough of Ford City v. United States*, 345 F.2d 645, 648 (3d Cir. 1965). Whatever the definition, it is abundantly clear that "the precise location of the ordinary high water mark at any given site on the shores of our Great Lakes remains a question of fact." *Glass*, 473 Mich. at 694, 703 N.W.2d at 73.

There is no evidence in this case that the plaintiff conducted any investigation to determine the location of the OHWM on the Kincaids' property. Rather, the attorney for the government readily acknowledged that she relied on an "administrative OHWM," which the Corps set at "581.5 feet IGLD in 1985." Pl.'s Resp. to Defs.' Supp. Br. Ex. 1, Halliday Aff. at ¶ 12. There are no federal regulations that establish, authorize, or condone the establishment of an "administrative" ordinary high water mark. The Michigan legislature has established an OHWM figure for Lake Huron (of which Saginaw

-17-

Bay is a part) of 579.8 feet IGDL based on the 1955 survey for certain regulatory purposes, *see* Mich. Comp. Laws § 324.32502; but the Michigan courts reject that delineation for the purpose of determining the rights, privileges, obligations, and responsibilities of shoreline landowners. *Glass*, 473 Mich. at 682-85, 703 N.W.2d at 66-69.  However, the concept of an administrative OHWM finds no support in federal law.  Moreover, it appears that the Corps has chosen the highest level reached by Lake Huron in decades as its selection of an "ordinary" high water mark.  That choice violates the traditional notion of the concept of an *ordinary* high water mark, which was intended to account for the day-to-day fluctuations of the levels of oceans, and later lakes and rivers, if not due to tides then as a result of wind and weather.  Moreover, the selection of an extraordinarily high lake level as the administrative OHWM alone defies the plain meaning of the term "ordinary."  *See* Oxford English Dictionary (2004) (defining the word as "[b]elonging to the regular or usual order or course of things; having a place in a fixed or regulated sequence; occurring in the course of regular custom or practice; normal; customary; usual").  The historic maximum lake level cannot constitute an "ordinary" high water mark as that term is defined by the cases and regulations or the common-sense meaning of the term's constituent words.  Based on the language of the regulations and the case law, it appears that land on which non-aquatic vegetation grows is above the OHWM.

The Court finds, therefore, that reliance by the government on an administrative OHWM was unreasonable.  Likewise, the failure to perform any investigation to determine factually the location of the OHWM on the Kincaids' land based on the definition of that boundary in the government's own regulations was equally unreasonable.  Absent such investigation, there was no basis to claim that the Kincaids' beach-grooming activity took place within the navigational servitude of the United States (i.e. the Great Lakes bottomland), and the allegations that they did are not substantially justified.

-18-

2.

The government also alleged that the discharge and sidecasting of the sand occurred in wetlands adjacent to navigable waters.  The CWA prohibits the discharge of any pollutant into waters of the United States from a point source, except in compliance with an NPDES permit issued pursuant to section 402.  33 U.S.C. §§ 1311(a), 1342(a).  It is undisputed that the Kincaids did not obtain a permit before commencing their activities on their property.  To establish a violation under Section 1311, the government must show that the defendants (1) discharged, (2) a pollutant, (3) into the waters of the United States, (4) from a point source.  *See North Carolina Shell Fish Growers Ass'n v. Holly Ridge Assocs., LLC*, 278 F. Supp. 2d 654, 675 (E.D. N.C. 2003) (citing *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 532 (9th Cir. 2001)).  As noted earlier, "the waters of the United States" include "wetlands adjacent to [covered] waters," including tributaries. 33 C.F.R. § 328.3(a)(7).  "The term 'wetlands' means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions."  33 C.F.R. § 328.3(b).

Just last term – well after the government's pre-suit investigation was completed – the Supreme Court provided additional guidance on the subject of wetlands and when they fall within the jurisdiction of the United States under the CWA.  The Court stated that the waters to which the wetlands must be connected are "those relatively permanent, standing or continuously flowing bodies of water forming geographic features that are described in ordinary parlance as streams, oceans, rivers, and lakes."  *Rapanos v. United States*, 126 S.Ct. 2208, 2225 (2006)  (internal quotes and alterations omitted).  Saginaw Bay certainly fits within that definition.  "[W]etlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear

-19-

demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act." *Id.* at 2227.  Concurring with the plurality, Justice Kennedy wrote that "navigable waters" under the CWA requires that "a water or wetland must possess a 'significant nexus' to waters that are or were navigable in fact or that could reasonably be made so."  *Id.* at 2236.

A discharge of sand from a point source violates section 1311.  Despite the Kincaids' assertions to the contrary, "[t]he fact that the [sand] or other pollutants may have originated in the same waters into which they are later being added does not prevent this addition from being a discharge for purposes of the CWA."  *North Carolina Shell Fish Growers*, 278 F. Supp. 2d at 666.  Moreover, "even if the material discharged originally comes from the streambed itself, . . . resuspension may be interpreted to be an addition of a pollutant under the Act," *Rybachek v. EPA*, 904 F.2d 1276, 1285 (9th Cir. 1990), and a "landowners' redepositing activities would significantly alter the character of the wetlands and limit the vital ecological functions served by the tract."  *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 923 (5th Cir. 1983).  A bulldozer is considered a point source for purposes of the CWA.  *United States v. Lambert*, 915 F. Supp. 797, 802 n.8 (S.D. W.Va. 1996) (holding that "point source" for purposes of CWA embraces the broadest possible definition of any identifiable instrument from which pollution might enter the waters of the United States, including bulldozers).

The government contends that the defendants' beach constitutes a wetland under the meaning of the statute in order to claim that its jurisdiction extends to the beach where the defendants leveled the beach sand.  Although current law may cast some doubt on that claim, given *Rapanos*' requirement that there be "a continuous surface connection" to covered waters, *id.* at 2227, the Court believes that the evidence supports this contention under the law as it existed at the time this lawsuit was

-20-

commenced.  There is no dispute that the beach abuts a Great Lake.  At the time, the Corps defined "adjacent" very broadly as well:  "[w]etlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.'"  33 C.F.R. § 328.3(c).  This view was accepted by the Sixth Circuit.  *See United States v. Rapanos*, 376 F.3d 629, 639-40 (6th Cir. 2004), vacated by *Rapanos v. United States*, __ U.S. __, 126 S.Ct. 2208 (2006).  In Marion Kincaid's letter to the Department of the Army dated June 21, 2001, she "admit[ed] that the vegetation I have seen growing the last two years is the worst I have ever seen and water does accumulate in low spots after a heavy storm.  This water generally dissipates after a few days of hot weather.  There has never been any vegetation in the water, no matter what the water level."  Defs.' Supp. Br. Mot. for Atty. Fees Ex. 4, Letter from Marion Kincaid to Dept. of Army of 6/21/01.  The government's agent, Leiteritz, observed that "the properties in that area had been left undisturbed had the wetland vegetation was starting to reestablish.  They were starting to look very much different than the Kincaid property."  Defs.' Supp. Br. Mot. for Atty. Fees Ex. 1, Leiteritz Dep. at 134-35. Moreover, the government has submitted photographs of the defendants' cleared property with growing vegetation on the neighbor's property.  Govt.'s Resp. to Defs.' Supp. Br. Ex. 2-3, Photographs of Kincaid Property.  This evidence of vegetation growth on the beach and that the Kincaid's activities were interfering with that growth supports the government's position that beach grading occurred in a wetland area and violated the CWA.  The Court finds, therefore, that this alternative claim of the government was substantially justified.

Although the defendants were prevailing parties in this lawsuit, the government has shown that at least some of the allegations in the complaint were substantially justified, and therefore the

defendants are not entitled to fees and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A)&(D).

III.

The Court also asked the parties to brief the question whether the defendants are entitled to sanctions under Rule 11 of the Federal Rules of Civil Procedure.  Rule 11 states that a party or attorney who signs a pleading or court paper may be liable for costs and attorney's fees if the paper is presented for an improper purpose, the allegations are unwarranted in law, or the factual allegations have no evidentiary support.  Fed. R. Civ. Pro. 11(b)(1)-(3).

In *Century Products, Inc. v. Sutter*, 837 F.2d 247, 253 (6th Cir. 1988), the Sixth Circuit first explained that the test for the imposition of Rule 11 sanctions is whether the individual attorney's conduct was "reasonable under the circumstances."  "A good faith belief in the merits of a case is insufficient to avoid sanctions" under Rule 11.  *Tahfs v. Proctor*, 316 F.3d 584, 594 (6th Cir. 2003).

> Under Rule 11, sanctions may be imposed if a reasonable inquiry would have disclosed that the pleading, motion or other paper was not well-grounded in fact.  *See Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1174 (D.C. Cir. 1985).  As soon as the complaint is filed, Rule 11 applies to the conduct of plaintiffs' counsel.  After the complaint is filed, plaintiffs' counsel retain a continuing responsibility to review their pleadings and, if necessary, to modify them to conform with Rule 11.  "Failure to do so permits the district court, within its discretion, to impose sanctions against the offending litigant or attorney when a reasonable inquiry would have disclosed that the complaint was either lacking in factual support or unwarranted by existing law."  *Herron v. Jupiter Transportation Co.*, 858 F.2d 332, 336 (6th Cir. 1988).

*Mann v. G & G Mfg., Inc.*, 900 F.2d 953, 959 (6th Cir. 1990).

"[T]he central purpose of Rule 11 is to deter baseless filings in district court."  *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990).  Moreover, "Rule [11] must be read in light of concerns that it will spawn satellite litigation and chill vigorous advocacy."  *Ibid.*  Rule 11 "'is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories.'"  *McGhee v. Sanilac*

-22-

*County*, 934 F.2d 89, 92 (6th Cir. 1991) (quoting Fed. R. Civ. P. 11 advisory committee's note).  "In this Circuit, the test for whether Rule 11 sanctions are warranted is whether the conduct for which sanctions are sought was 'reasonable under the circumstances.'"  *Salkil v. Mount Sterling Twp. Police Dep't*, 458 F.3d 520, 528 (6th Cir. 2006).

Rule 11 also contains procedural requirements intended to create a safe harbor for litigants by giving them an opportunity to withdraw offending pleadings.  The rule requires a separate motion seeking sanctions, service of the motion twenty-one days before filing it with the court, and allowance during that interval for withdrawing the challenged court paper.  Fed. R. Civ. P. 11(c)(1)(A).  The procedural requirements of Rule 11 were not met by the defendants in this case because they did not file a separate motion seeking Rule 11 sanctions and provide the government with the protections of Rule 11's safe harbor.  The Sixth Circuit "has expressly ruled that Rule 11 is unavailable where the moving party fails to serve a timely 'safe harbor' letter."  *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 510-11 (6th Cir.  2002) (citing *Ridder v. City of Springfield*, 109 F.3d 288, 297 (6th Cir. 1997)).  Therefore, Rule 11 sanctions are not available to the defendants in this case.

## IV.

The defendants also seek sanctions under 28 U.S.C. § 1927 and the Court's inherent power.  The statute states that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927.  Under this statute, the attorney's subjective bad faith is not relevant because the Court applies an objective standard, and "sanctions under section 1927 [are appropriate] when it determines that an attorney reasonably should

know that a claim pursued is frivolous.'" *Salkil*, 458 F.3d at 532 (quoting *Jones v. Continental Corp.*, 789 F.2d 1225, 1230 (6th Cir.1986)).

In *Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991), the Supreme Court held that "'there are ample grounds for recognizing . . . that in narrowly defined circumstances federal courts have inherent power to assess attorney's fees against counsel [or the client],' even though the so-called 'American Rule' prohibits fee shifting in most cases." *Id.* at 45 (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980)).

The Court does not find, however, that fees and costs are appropriate under either of these alternate theories. Although the government's theory of liability that the defendants were conducting prohibited activity on Great Lakes bottomlands was unsupported in law or reasonable investigation, its alternate wetlands theory was closely related and substantially justified at that time. The Court does not find that the claim was frivolous or that the case falls within the narrowly-defined circumstances justifying invocation of the Court's inherent powers.

## V.

Finally, the defendants challenge the Clerk's refusal to tax any costs. They contend that they are entitled to costs including (1) the $150 filing fee, (2) $2,838 in court reporter fees, and (3) $1,598.03 for exemplification and copy fees. They have supported this bill of costs with the declaration of Jonathan C. Martin with documentation of costs attached to the motion. The Clerk of Court, however, denied the defendants' taxation of these costs stating: "No 'Judgment' was entered in this case, consequently all costs are denied." Taxed Bill of Costs [dkt #77].

Rule 54(d) provides that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." The Court has determined that the defendants are prevailing parties. Therefore they are entitled to appropriate costs.

Under the Bill of Costs Handbook, certain fees including the "[f]iling fee of complaint" is a taxable cost. Handbook § II(A)(1). Accordingly, the Kincaids should receive their filing fee. Additionally, fees of court reporters for all or any of the transcript necessarily obtained for use in the case may also be taxed. The Handbook states: "Counsel is directed to attach to the bill of costs, a copy of the court's order directing preparation of transcript or the stipulation of parties agreeing to its preparation, if applicable. If transcript was used in support of a motion, counsel is required to provide the taxation clerk with the title of the motion and the approximate date it was filed." Handbook § II(B). The following Court Reporter fees are taxable under this rule: (a) transcript procured at direction of court; (b) transcript ordered for appeal purposes; (c) transcript prepared pursuant to stipulation of parties with agreement to tax as costs; (d) transcript used at trial to impeach witness(es); (e) transcript used in support of a motion; (f) fees for attendance and travel of the Court Reporter for depositions. The Handbook requires counsel to attach documentation if applicable. Further, if the "transcript was used in support of a motion, counsel is required to provide . . . clerk with the title of the motion and approximate date it was filed." *Ibid.* None of these transcripts were used at a hearing. Further, although the defendants did state that the transcripts were used in support of a motion pursuant to the Handbook's requirement, they failed to specify which motions. Therefore, the Court does not find error on the part of the Clerk on the issue of transcripts. Finally, the Kincaids seek the cost of making copies for papers necessarily obtained for use in the case. The Handbook states: "The cost of securing translations for exemplification of matters before the court, copies of papers

-25-

necessarily obtained for use in a case, and the cost of obtaining charts, models . . . are *not* recoverable within the discretion of the taxation clerk *unless* counsel has previously secured an order authorizing the recovery of these costs.  Routine copy expenses; those made for service, filing or for the convenience of counsel are *not* taxable within the discretion of the taxation clerk." Handbook § II(F). Because the defendants have failed to explain how the Clerk abused her discretion in this instance, these costs also will be denied.

VI.

The Court finds that the defendants are prevailing parties within the meaning of the Equal Access to Justice Act, but the government has met its burden of showing that at least a part of its theory of liability was substantially justified.  The defendants have not show that they are entitled to attorney's fees or other expenses of litigation under 28 U.S.C. § 1927 or the Court's inherent power. However, the defendants are entitled to a portion of their taxed costs under Rule 54(d).

Accordingly, it is **ORDERED** that the defendants' motion for attorney's fees and expenses [dkt #71] is **DENIED**.

It is further **ORDERED** that the defendants' motion to review the actions of the Clerk of the Court taxing no costs [dkt #81] is **GRANTED IN PART AND DENIED IN PART**.  The defendants may recover costs from the plaintiff in the amount of $150.

s/David M. Lawson_____
DAVID M. LAWSON
United States District Judge

Dated: November 3, 2006

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 3, 2006.

s/Felicia M. Moses
FELICIA M. MOSES